**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Case No. CCB-11-569 |
| ROY LEE CLAY. | |

## MEMORANDUM

In this post-conviction proceeding, Roy Lee Clay asks the court to do one of four things: (1) vacate his conviction and sentence as violating the Sixth Amendment to the U.S. Constitution; (2) resentence him under the First Step Act of 2018; (3) grant him compassionate release and reduce his sentence to time served due to his susceptibility to severe infection from COVID-19; or (4) modify his sentence under the compassionate release statute because of the disparity between his actual sentence and the sentence he would face were he sentenced today. For the following reasons, the court will grant the fourth of Clay's requests and modify his sentence to 15 years of incarceration followed by 10 years of supervised release. Clay's three remaining requests will be denied.

## BACKGROUND

The court begins with the factual, legal, and procedural background necessary to resolve Clay's motions. On November 8, 2011, Clay was arrested for his role in a large-scale heroin distribution operation. (Presentence Report at 1, ¶¶ 1-8, ECF 794, ("PSR"); Initial Appearance, ECF 33). The court ordered Clay detained pending trial, and he has remained in federal custody ever since. (*See* Order of Detention, ECF 74). Four years and three jury trials later, a jury convicted Clay on October 14, 2015, of one count of conspiracy to distribute heroin in violation of 21 U.S.C. §§ 841, 846 (2012). (*See* Verdict Form at 2, ECF 780). As part of its verdict, the jury found beyond

a reasonable doubt that at least one kilogram of heroin was reasonably foreseeable to Clay. (*Id.*).

The court sentenced Clay to 30 years imprisonment followed by 10 years of supervised release.

(Am. J. at 2-3, ECF 815; Tr. of Sentencing Hr'g at 23:10-14, ECF 840, ("Tr.")).

Several factors informed the court's sentence. As a starting point, Clay's conviction carried a base offense level of 30. (PSR ¶ 12). From there, the court applied a career offender enhancement based on Clay's prior convictions, but imposed no additional adjustments related to victims, role, obstruction of justice, acceptance of responsibility, or other reasons. (*See* Am. J.; Statement of Reasons, ECF 816 ("SOR"); Tr. at 23:10-14; PSR ¶¶ 12-20). This produced a total offense level of 37. (SOR at 1; PSR ¶ 20; *see* Am. J.). Clay also had four criminal history points, which would have placed him in criminal history category III, but his career offender status increased his criminal history to category VI. (SOR at 1; PSR ¶ 40). All told, this produced a total offense level of 37 and a criminal history category of VI, for which the U.S. Sentencing Guidelines provided a sentencing range of 360 months to life imprisonment. (*Id.* ¶ 83). Under the U.S. Code—which operates in tandem with, but independently from, the Guidelines—Clay's sentence at the time also carried a mandatory minimum of 20 years because of his prior offenses, a minimum that was not outcome determinative for Clay because it was below the bottom of the Guideline range.[1] *See* 22 U.S.C. §§ 841, 846, 851 (2012). Considering all this, and the factors in 18 U.S.C. § 3553(a) (2012), the court sentenced Clay to a 360-month term of incarceration followed by 120 months of

---

[1] At the time, 21 U.S.C. § 841(b) provided a 20-year mandatory minimum for defendants with one prior controlled substance offense and a mandatory life sentence for defendants with two prior controlled substance offenses. Under § 851, the Government must notify a defendant of its intent to seek a mandatory minimum. At Clay's third trial, the Government informed Clay it would seek a minimum based on only one of his prior convictions, even though it believed Clay had two qualifying prior controlled substance offenses. (851 Notice, ECF 789).

supervised release. (*See* Am. J. at 2-3; Tr. at 23:10-14). Clay began serving his prison sentence on December 18, 2015. (Reentry Plan at 2, ECF 904-6).

At least three significant legal developments have occurred since Clay's sentencing in 2015. First, in 2018, Congress passed the First Step Act. The Act introduced two changes relevant here. For one, the law amended 18 U.S.C. § 3582(c), a federal statute permitting courts to modify some otherwise final sentences through a process known as "compassionate release," by authorizing individual prisoners to move for compassionate release directly in federal court upon exhausting their administrative remedies, a cause of action previously available only to the federal Bureau of Prisons ("BOP"). First Step Act of 2018, Pub. L. No. 115-391, § 401(b)(1)(A), 132 Stat. 5194, 5239 (2018). And for two, it reduced the length of certain mandatory minimum sentences, including those for possession with intent to distribute under 21 U.S.C. § 841(b), the provision of federal law under which DOJ sought a mandatory minimum for Clay. *Id.* § 401(b)(1)(A), 132 Stat. at 5220.

Second, the Fourth Circuit issued a decision narrowing the scope of the "career offender" enhancement in § 4B1.1 of the U.S. Sentencing Guidelines ("U.S.S.G."). The Guidelines permit courts to impose a "career offender" enhancement on a defendant's sentence where three conditions are met: "(1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1. When the court sentenced Clay in 2015, it applied the career offender enhancement to Clay's base offense level and criminal history category because Clay (1) was over 18 at the time he committed the crime; (2) was convicted of conspiracy to distribute heroin, which

the parties agreed was a controlled substance offense; and (3) had two prior convictions for possession with intent to distribute (one federal and one state) which the parties also agreed were controlled substance offenses. In 2019, however, the Fourth Circuit held in *United States v. Norman*, 935 F.3d 232 (4th Cir. 2019) that conspiracy to distribute heroin (unlike possession with intent to distribute heroin) is not a controlled substance offense. Thus, the parties agree that were Clay sentenced today, he would no longer be subject to the career offender enhancements he faced in 2015 because the "instant offense of conviction" is not a "controlled substance offense" under § 4B1.1.

Third, the Fourth Circuit has expanded the circumstances in which courts may grant compassionate release. As explained, 18 U.S.C. § 3582(c) permits courts to grant compassionate release by modifying sentences in certain circumstances. These circumstances include where "extraordinary and compelling reasons [so-warrant.]" 18 U.S.C. § 3582(c)(1)(A)(i). In 2020, the Fourth Circuit held that the disparity between the sentence a defendant actually received and the one they would receive were they sentenced at the time they move for compassionate release can be so great that it amounts to an "extraordinary and compelling reason" for granting compassionate release. *United States v. McCoy*, 981 F.3d 271, 286 (4th Cir. 2020). At around the same time, the court also began to recognize that susceptibility to severe infection from COVID-19 could also create an "extraordinary and compelling" circumstance warranting compassionate release. *See, e.g.*, *United States v. McCarson*, 818 F. App'x 272 (4th Cir. 2020) (per curiam).[2]

Clay's motions are primarily based on these changes in the law since the time of his sentencing. Clay filed his first motion in March 2018, asking the court to vacate his sentence under

---

[2] Unpublished decisions are cited for the soundness of their reasoning only, not for any precedential value.

28 U.S.C. § 2255 for ineffective assistance of trial and appellate counsel in violation of his Sixth Amendment rights. (Mot. to Vacate, ECF 873, ("§ 2255 Mot.")). After Congress passed the First Step Act at the end of 2018, Clay filed a supplement to his § 2255 motion in 2019 seeking resentencing under the Act. (Mot. to Supp. § 2255 Mot., ECF 886). Then in March 2021, through counsel, Clay filed a motion for compassionate release on the grounds that his underlying medical conditions made him susceptible to severe infection from COVID-19 and asking the court to reduce his sentence to time served. (Mot. for Compassionate Release, ECF 904, ("CR Mot.")). Finally, in June 2021, also through counsel, Clay filed a supplement to his initial compassionate release motion requesting a sentencing modification due to the disparity between his sentence and the sentence he would receive were he sentenced today. (Mot. to Supp. CR Mot., ECF 918). Clay's motions are fully briefed, and no oral argument is necessary. *See* Local Rule 105.6. The court now considers the four requests set out in Clay's motion for compassionate release, motion to vacate, and supplemental filings.

## ANALYSIS

### I. Motion for Compassionate Release

Clay's most recent filings request compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). (*See* CR Mot.; Mot. to Supp. CR Mot.). A court may grant compassionate release or otherwise modify a previously imposed sentence where "extraordinary and compelling reasons" warrant release or modification and the outcome is consistent with the factors enumerated in 18 U.S.C. § 3553(a). *See McCoy*, 981 F.3d at 275-76. Clay asks the court to modify his sentence for two reasons: (1) the disparity between his sentence and the sentence he would face were he sentenced today and (2) his elevated risk of contracting a severe case of COVID-19. The Fourth Circuit has recognized that both grounds can amount to extraordinary circumstances warranting

compassionate release. For the following reasons, the court will grant Clay's motion for a sentence reduction based on the length of his sentence but deny his request to reduce his sentence to time served based on his risk of contracting a severe case of COVID-19.

**A. Clay's Motion for Compassionate Release Based on the Length of his Sentence**

Under the Fourth Circuit's decision in *McCoy*, a sentence modification may be warranted by (1) "the disparity between" the defendant's actual sentence and the sentence the defendant would receive today; (2) "the severity of" the defendant's sentence; and (3) the defendant's "individual circumstances," including the § 3553(a) factors. *McCoy*, 981 F.3d at 286. After considering each of these factors, the court will modify Clay's initial 30-year sentence to 15 years.

*i.   The disparity between Clay's sentence and the sentence he would face today*

Clay submits that were he sentenced today, he would be subject to a guideline sentence of 121-151 months with no mandatory minimum, rather than the 360-months-to-life guideline and 20-year mandatory minimum he actually faced when this court sentenced him in 2015. Clay reaches this conclusion by observing that the career offender enhancement in U.S.S.G. § 4B1.1 would not apply to him today because he was convicted of conspiracy to distribute, which the Fourth Circuit no longer considers a "controlled substance offense" under the guidelines, and then arguing he is now exempt from the mandatory minimum in 21 U.S.C. § 841(b), again because he was not convicted of a controlled substance offense. As a result, he asks the court to reduce his sentence from the 360 months it imposed to 121 months.

On the first point, the "Government concedes that," based on the Fourth Circuit's decision in *United States v. Norman*, 935 F.3d 232 (4th Cir. 2019), "were the Defendant to be sentenced today, he would not be determined to be a Career Offender pursuant to U.S.S.G. § 4B1.1(a) as his instant conviction for 21 U.S.C. § 846 is not a 'controlled substance offense' pursuant to U.S.S.G.

§ 4B1.2(b)." (Opp. to Def's Supp. to Mot. for Sentencing Reduction at 3, ECF 921). The court agrees. Thus, in calculating the sentencing disparity the court will not apply the career offender enhancement in § 4B1.1.

On the second point, however, the Government disagrees. Clay was convicted of conspiracy to distribute heroin in violation of 21 U.S.C. §§ 841 and 846. Under § 846, a defendant convicted of conspiracy is subject "to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy," here possession with intent to distribute under § 841. *See* 21 U.S.C § 846. And § 841(b) in turn provides that a defendant convicted of a substantive offense under § 841(a) involving certain minimum quantities of a controlled substance is subject to a mandatory minimum if they "commit[] *such a violation* after a prior conviction for a serious drug felony." *Id.* § 841(b)(1)(A) (emphasis added). Clay asserts that the language "such a violation" in § 841(b) refers to a controlled substance violation; the Government counters that it simply means a violation of § 841(a) involving a sufficient quantity.

Clay casts his reading of § 841(b) as following from the Fourth Circuit's decision in *Norman*, which held that conspiracy to distribute is not a controlled substance offense for purposes of the Guidelines' career offender sentencing enhancement. That is all *Norman* held, however. *Norman* discusses only whether a § 846 conviction can trigger § 4B1.1's career offender enhancement—it does not address the penalties laid out in § 841(b) or even so much as mention the term "mandatory minimum." Indeed, *Norman* interprets only the U.S. Sentencing Guidelines and has nothing to say about the U.S. Code. To conclude otherwise would be to interpret *Norman* as silently overruling an ocean of case law applying § 841(b)'s mandatory minimums to defendants convicted under § 846, a rule the Fourth Circuit established well before *Norman*, *see, e.g.*, *United States v. Green*, 436 F.3d 449, 460 (4th Cir. 2006), and has continued to apply since, *see, e.g.*,

*United States v. Goodwin*, 37 F.4th 948, 949-53 & n.4 (4th Cir. 2022). The court must follow this precedent. Thus, were Clay sentenced today, he would remain subject to § 841(b)'s mandatory minimum.

To determine Clay's sentence today, the court calculates his base level offense, revised to reflect any relevant adjustments. At Clay's initial sentencing, the parties agreed that because Clay was convicted of conspiracy to distribute over one kilogram of heroin, he had a base offense level of 30. The parties also agreed he was not subject to any adjustments based on victims, role, obstruction, acceptance of responsibility, or other special characteristics. He was, however, subject to a 7-level upward adjustment as a career offender, resulting in a total offense level of 37. Further, although his criminal history points would otherwise have placed him in criminal history category III, his career offender status elevated him to category VI. As discussed, Clay is no longer subject to career offender enhancements. And the court will not revisit the other adjustments the parties agreed upon at sentencing. Finally, the base offense level for Clay's offense and criminal history category remains the same. *See* U.S.S.G. § 2D1.1(c)(5); *id.* at Ch. 5, Pt. A. The court therefore concludes that if Clay were sentenced today, he would have a total offense level of 30 and be placed in criminal history category III.[3]

With a total offense level of 30 and a category III criminal history, Clay correctly concludes that his guideline sentence would be 121-151 months, or approximately 10-12.5 years. U.S.S.G. Ch. 5, Pt. A. For the reasons discussed above, however, he is also subject to a mandatory minimum

---

[3] The Government reminds the court it could have submitted a § 851 notice seeking an enhanced mandatory minimum based on two of Clay's prior convictions rather than the one prior conviction it actually noticed. At the same time, Clay suggests that under the Government's policy today, it likely would not pursue any mandatory minimum under § 851. The court will not engage in speculation on behalf of either side, but will instead consider only the one prior conviction the Government actually noticed at sentencing.

sentence of 15 years under §§ 841(b), 846, and 851, a minimum that exceeds the upper end of the guideline range. Thus, if the court were sentencing Clay today, it would have the option of imposing a 15-year sentence—exactly half the length of the sentence Clay received in 2015.

This conclusion reflects a "gross disparity" in sentences. *McCoy*, 981 F.3d at 285. As a relative matter, Clay received a sentence double the length of the sentence he would face today. And in absolute terms, Clay's sentence is 15 years longer than the sentence now applicable. This is just one year shorter than the 200-month discrepancy the *McCoy* court described as a "gross disparity," and so similarly probative evidence that Clay's sentence "is dramatically longer than" the sentence Congress and the Sentencing Commission now deem "necessary or fair." *See id.* at 285-86. For all these reasons, the discrepancy between Clay's original sentence and the sentence he would receive today suggests Clay's circumstances are "extraordinary and compelling."

### ii.   *The length and severity of Clay's sentence*

Clay's sentence is also undeniably severe. Clay was sentenced to 360 months in prison, a sentence which, based on 2021 data, is nearly 10 years longer than the current national average sentence for murder and over 20 years longer than the current national average sentence for drug trafficking.[4] Moreover, because Clay was in his forties when he was charged in this case, the 30-year sentence would imprison him into his seventies and the period of supervised release could extend into his eighties—effectively a sentence to life under court supervision. Thus, "the sheer and unusual length of" Clay's sentence weighs in favor of deeming this is an "extraordinary and

---

[4] *Statistical Information Packet, Fiscal Year 2021, Fourth Circuit* 11, U.S. Sentencing Commission (2022), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/4c21.pdf.

compelling" circumstance. *McCoy*, 981 F.3d at 285.

### iii.  Clay's individual circumstances

Even in "extraordinary and compelling" cases, the court must consider the § 3553(a) factors, *see* 18 U.S.C. 3582(c)(1)(A), and the defendant's other "individual circumstances," *see McCoy*, 981 F.3d at 286, to determine whether a sentence modification is warranted. Under this framework, the court considers (1) "the nature and circumstances of the offense," including the defendant's "history and characteristics;" (2) the sentence needed to "reflect the seriousness of the offense," deter future criminal conduct, "protect the public from further crimes of the defendant," and "provide the defendant with . . . correctional treatment;" and (3) other individual circumstances including the defendant's age, time served, and institutional record. *See* 18 U.S.C. § 3553(a); *McCoy*, 981 F.3d at 286.

First, the nature of Clay's offense is serious. As the court explained at sentencing, "dealing heroin is a very serious and dangerous offense" that "kills people" and "destroys people's families." (Tr. at 22:11-12, 21). And Clay "had a very significant role over a long number of years in dealing in that very dangerous drug." (*Id.* at 22:22-24). His record also reflected a "very consistent and lengthy pattern of criminal conduct." (*Id.* at 21:20-21). Thus, the court reiterates what it said in 2015: "This is a very serious offense." (*Id.* at 20:25).

Second, in setting new mandatory minimums when it passed the First Step Act, Congress reaffirmed that serious consequences are necessary for conduct such as Clay's. In reducing the length of certain mandatory minimums, however, Congress also expressed its view that the prior sentences were "unnecessary" to adequately deter similar conduct and protect the public, "in effect, a legislative rejection of the need to impose sentences under" the prior mandatory minimums, "as well as a legislative declaration of what level of punishment is adequate." *See McCoy*, 981 F.3d at

285 (quoting *United States v. Redd*, 444 F. Supp. 3d 717, 723 (E.D. Va. 2020)). In Congress's view, a 15-year sentence now accurately reflects the seriousness of the crime Clay committed and sufficiently deters future criminal conduct while simultaneously protecting the public.

Third, Clay's individual circumstances favor a reduction in line with Congress's newly passed minimums. For starters, Clay has a strong record during his current period of incarceration, including positive work reports and not a single disciplinary incident, an improvement from his prior periods of incarceration and an indicator of his progress over time. (Reentry Plan at 2). His age also favors a sentence reduction because he has been diagnosed with medical conditions, including pre-diabetes, which may negatively affect his health outcomes as he ages. On top of that, a fifteen-year mandatory minimum would place Clay near sixty at his time of release (and nearing seventy when he completes supervised release), an age where reoffending becomes dramatically less likely for individuals with his criminal history.[5] Finally, Clay has a promising release plan, under which counsel represents he will have both stable housing and employment. (CR Mot. at 11-12). All together, then, the § 3553(a) factors and Clay's personal circumstances are consistent with a sentence modification to 15 years.

Ultimately, the court concludes the length and disparity of Clay's sentence create an "extraordinary circumstance" justifying a sentence modification, and that calibrating his sentence to the current mandatory minimum of 15 years is consistent with the § 3553(a) factors and his individual circumstances. The court will grant Clay's motion for compassionate release in part and

---

[5] *The Effects of Aging on Recidivism Among Federal Offenders* 17 & Figs. 8-9, U.S. Sentencing Commission (2017), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

modify his sentence to a term of 15 years followed by 10 years of supervised release.

### B. Clay's Motion for Compassionate Release Based on COVID-19 Risk Factors

COVID-19 vulnerability may also present an "extraordinary and compelling" circumstance justifying compassionate release. Clay asks for compassionate release on this basis because he is overweight and has been diagnosed with hypertension, hyperlipidemia, and pre-diabetes, each of which he asserts put him "at increased risk of severe illness or death if he contracts COVID." (CR Mot. at 10). He adds that Fort Dix, where he is currently incarcerated, is a COVID "hot spot," (*id.* at 7), and indeed BOP data suggest Fort Dix has experienced more COVID-19 cases than any other BOP facility in the country: 1,300 cases as of December 2022 at a facility with a population of around 3,000 people.[6] In light of these circumstances, Clay asks the court to reduce his "sentence to time served." (CR Mot. at 13).

To determine Clay's vulnerability, the court relies on the Centers for Disease Control's ("CDC's") guidance on underlying conditions that increase risk of severe illness related to COVID-19.[7] According to the CDC, a body mass index above 25, like Clay's, increases susceptibility to a severe case of COVID-19, and hypertension "possibly" does too. *Id.* Although Type 1 and 2 diabetes are listed as high-risk factors, pre-diabetes is not identified. *Id.* Neither is hyperlipidemia. *Id.* Clay's age—over 45 but under 65—poses a moderate risk. *Id.* Last, the court is well aware that "[p]risons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19," *Coreas v. Bounds*, 451 F. Supp. 3d 407, 413 (D. Md. 2020), and Fort Dix has an

---

[6] *COVID-19 Coronavirus, COVID-19 Cases*, Federal Bureau of Prisons (last visited Dec. 13, 2022), available at https://www.bop.gov/coronavirus/; *FCI Fort Dix*, Federal Bureau of Prisons (last visited Dec. 13, 2022), available at https://www.bop.gov/locations/institutions/ftd/.

[7] *See People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Oct. 19, 2022).

especially dire track record of infections.

Even if Clay's health conditions were an extraordinary and compelling reason for release, however, the compassionate release statute provides that, before reducing a defendant's sentence for "extraordinary and compelling reasons," the court must consider the factors set forth in 18 U.S.C. § 3553(a) "to the extent they are applicable." *See* 18 U.S.C. § 3582(c)(1)(A). Although the § 3553(a) factors are compatible with a sentence reduction to 15 years, they weigh against reducing Clay's sentence to time served. As the court has explained, Clay committed a serious and dangerous offense involving a significant quantity of drugs, and Clay's background revealed a history of similar conduct. Moreover, even with credit for time served in pretrial detention and satisfactory performance, Clay has served less than half of his initial 30-year sentence. Accordingly, the court finds that although a sentence reduction is warranted under the § 3553(a) factors, a reduction to time-served is not.

For the foregoing reasons, the court will not reduce Clay's sentence to time-served, but will grant his motion for compassionate release in part and modify his sentence to 15 years followed by 10 years of supervised release.

## II. Motion to Vacate Under 28 U.S.C. § 2255

In addition to his motion for compassionate release, Clay moves to vacate his conviction and sentence under 28 U.S.C. § 2255. Clay's motion is based on the purportedly ineffective assistance of his trial and appellate counsel, Michael Montemarano. "[A]n ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 504 (2003). When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient, and that the deficient performance prejudiced the

defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness," *id.* at 688, and must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance,'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Clay raises at least five discrete instances in which he believes he was prejudiced by Montemarano's performance, which the court will address in turn. Clay also supplements his § 2255 motion with a request for resentencing under the First Step Act. The court will conclude its discussion of Clay's § 2255 motion by addressing this request. In the end, the court concludes that none of Clay's claims provide a basis for relief under § 2255.

### A.  Montemarano's Failure to Request a Knowledge Instruction

First, Clay argues the court's jury instruction on conspiracy to distribute a controlled substance was deficient under the Supreme Court's decision in *McFadden v. United States*, 576 U.S. 186 (2015), and that his attorney unreasonably failed to request an appropriate instruction. Clay characterizes *McFadden* as standing for the proposition that the knowledge element of a conspiracy to distribute conviction must be supported by evidence that the defendant either knew what type of substance the conspiracy was distributing, or, if the defendant lacked knowledge of the precise type of substance, that he was aware it was a controlled one. In Clay's view, the court's conspiracy instruction did not require the jury to find either of these elements, instead permitting it to convict Clay if the Government proved only two elements beyond a reasonable doubt: (1) "that two or more persons entered the unlawful agreement charged in the first count of the

indictment," and (2) "that the defendant in question knowingly, willfully, and voluntarily became a member of the conspiracy." (Jury Instructions at 12, ECF 777). Clay contends that because the court's instruction omitted the knowledge element he asserts *McFadden* requires, Montemarano's failure to challenge it was both unreasonable and prejudicial.

Clay is correct that *McFadden* changed the knowledge requirement applicable to the substantive offense of possession with intent to distribute under § 841(a), but the holding does not change the outcome here. *McFadden* addressed the level of knowledge § 841(a)(1) requires to convict a defendant of "manufactur[ing], distribut[ing], or dispens[ing], or possess[ing] with intent to manufacture, distribute, or dispense, a controlled substance." *McFadden*, 576 U.S. at 193 (quoting 21 U.S.C. § 841(a))). The Court held that to violate the statute, "the Government" must "establish that the defendant knew he was dealing with 'a controlled substance.'" *Id.* at 188-89. Such knowledge could be demonstrated, the Court explained, either by (1) "showing that the defendant knew he possessed a substance listed on the schedules, even if he did not know which substance it was," or (2) "showing that the defendant knew the identity of the substance he possessed." *Id.* at 192; *see also United States v. McFadden*, 823 F.3d 217, 223 (4th Cir. 2016) (applying on remand the Court's test in the context of the Controlled Substance Analogue Enforcement Act). For example, a "defendant whose role in a larger drug organization is to distribute a white powder to customers" has the requisite knowledge if he knows "the white powder is listed on the schedules even if he does not know precisely what substance it is." *Id.* And the same is true of "a defendant who knows he is distributing heroin but does not know that heroin is listed on the schedules . . . [b]ecause ignorance of the law is typically no defense to criminal prosecution." *Id.* (citation omitted). Clay, then, is essentially correct that a § 841 conviction requires proving either that the defendant knew what type of substance the conspiracy was

distributing, or proving the defendant knew that whatever substance the conspiracy was distributing, the substance was controlled.

But Clay's conviction is consistent with the rule articulated in *McFadden*. Assuming *McFadden* affects the elements of a conviction under § 846 (not just under § 841), Clay would still be unable to show that a different jury instruction would have changed the outcome of his case.[8] Clay offers two arguments under *McFadden*. First, he suggests his conviction cannot be sustained because the jury instruction did not require the government to prove "Clay knew that the substance that was involved in the conspiracy was heroin." (§ 2255 Mot. at 15). That cannot have prejudiced Clay, however, because the jury in fact found that it was reasonably foreseeable to Clay that the conspiracy involved an intent to possess or distribute at least one kilogram of heroin. (Verdict Form at 2). Second, Clay suggests his conviction was deficient because the jury instruction did not require the government to prove Clay knew "heroin was a controlled substance." (*See* § 2255 Mot. at 15). But the court's instruction here *did* accommodate Clay's request: the court specifically instructed the jury that to convict Clay it must find he participated in the conspiracy "with an awareness of" its "basic aims and purposes," that is, with knowledge it was a conspiracy to distribute a controlled substance. (Jury Instructions at 14, 17). So in convicting Clay, the jury

---

[8] On remand, the Fourth Circuit's discussion of *McFadden* seemed to recognize the decision effected the knowledge element under § 846. *See McFadden*, 823 F.3d at 224, 228. Still, the Fourth Circuit's subsequent decisions have articulated the same three elements of conspiracy it identified prior to *McFadden* and which informed Clay's jury instructions. *Compare United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc) *with United States v. Ath*, 951 F.3d 179, 185 (4th Cir. 2020). That is "[b]ecause § 846 looks to an underlying offense," and thus "the mens rea of § 846 is derived from that of the underlying offense, in this case § 841(a)." *United States v. Ali*, 735 F.3d 176, 186 (4th Cir. 2013); *see also United States v. Wall*, No. 19-cr-0500, 2022 WL 1268061, at *4 (D. Md. Apr. 28, 2022). In this way, the elements of conspiracy include the *McFadden* rule by implicitly requiring the government to prove a defendant entered a conspiracy to distribute a substance the defendant either knew was controlled or knew the identity of. *But see infra*, Note 9.

necessarily found the requisite level of knowledge. The Government thus satisfied its burden of proving knowledge under both methods of proof, even though only one method would be sufficient. Accordingly, Clay cannot show that a more specific jury instruction on knowledge would have changed the outcome of his case and can show no prejudice warranting vacatur of his conviction on this ground.[9]

### B.  Montemarano's Failure to Challenge Clay's Career Offender Status

Second, Clay contends Montemarano acted unreasonably in failing to challenge Clay's career offender status at sentencing under the principles articulated in the Supreme Court's decisions in *Taylor v. United States*, 495 U.S. 575 (1990), *Descamps v. United States*, 570 U.S. 254 (2013), and *Mathis v. United States*, 579 U.S. 500 (2016), as well as the Fourth Circuit's related opinions in *United States v. Royal*, 731 F.3d 333 (4th Cir. 2013) and *United States v. Carthorne*, 878 F.3d 458 (4th Cir. 2017). Clay argues that, under these cases, his prior conviction for possession with intent to distribute heroin under Maryland law was not a qualifying controlled substance offense for purposes of U.S.S.G. 4B1.1(a), and thus the court improperly applied the career offender enhancement to his sentence.[10] Montemarano's failure to challenge the court's

---

[9] As another court in this District has observed, the Supreme Court's opinion in *McFadden* was accompanied by a "well-reasoned concurrence by Chief Justice Roberts, in which he argued that the majority's analysis of the knowledge requirement under § 841(a)(1) was incorrect" to the extent it suggested the government could prove knowledge by showing the defendant knew the identity of the substance in question, "and should be disregarded by lower courts as dicta since it was not critical to the Court's ultimate conclusion on the question before it." *Wall*, 2022 WL 1268061, at *4 (quoting *McFadden*, 576 U.S. at 198-99 (Roberts, C.J., concurring)). But that does not mean Montemarano acted unreasonably in declining to pursue the theory that Clay was unaware heroin is a controlled substance. And as already explained, the court *did* instruct the jury that to convict Clay he must have known the conspiracy's purpose was to distribute a controlled substance, so the conviction stands on a method of proof independent of the one Chief Justice Roberts called into question.

[10] Clay does not dispute that his second predicate offense, a 1993 conviction for possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1), qualifies.

error, he concludes, was both unreasonable and prejudicial.[11] The court agrees with Clay that Maryland's possession with intent to distribute law is not a "controlled substance offense" for purposes of the Sentencing Guidelines, but concludes that Monemarano's failure to challenge Clay's career offender status on this basis in 2015 was reasonable.[12]

As the court has explained, a defendant qualifies for a career offender enhancement under U.S.S.G. 4B1.1(a) only if they have "at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. 4B1.1(a). In *United States v. Campbell*, 22 F.4th 438, 440 (4th Cir. 2022), the Fourth Circuit held that "the Sentencing Guidelines' definition of a 'controlled substance offense' does not include an attempt crime." The court explained that to "determine whether a conviction under an asserted predicate offense statute . . . constitutes a 'controlled substance offense' as defined by the Sentencing Guidelines," it applies what is known as the "categorical approach." *Id.* at 441. Under the categorical approach, if "the 'least culpable' conduct criminalized by the predicate offense statute does not qualify as a 'controlled substance offense,' the prior conviction cannot support a career offender enhancement. *Id.* (quoting *United States v. King*, 673 F.3d 274, 278 (4th Cir. 2012)). After a thorough analysis, the court concluded the Guidelines' definition of "controlled substance offense" does not cover attempt crimes. *Id.* at 441-47. As a result, the underlying predicate offense at issue, in that case a conviction for possession with intent to distribute under West Virginia law, was not a "controlled substance

---

[11] The parties dispute the extent to which Montemarano actually did challenge Clay's career offender status at sentencing and again on appeal. To clarify: Montemarano did *not* challenge Clay's *status* as a career offender under the guidelines; he *did* object to the court exercising its discretion to *apply* the career offender enhancement to Clay as a matter of policy. (Tr. at 8:19-20, 10:4-14).

[12] Clay's § 2255 motion does not claim Montemarano was ineffective for failing to argue Clay's § 846 violation itself was not a controlled substance offense, so the court does not address it here.

offense" for purposes of the Guidelines because the West Virginia statute included attempt and thus criminalized a broader range of conduct than the Guidelines' definition. Said another way, it was possible to violate West Virginia's possession with intent to distribute law through conduct—specifically, attempted possession—that "does not qualify as a 'controlled substance offense'" under the Guidelines. *Campbell*, 22 F.4th at 441. So a conviction for violating the West Virginia statute could not serve as a predicate offense for a career offender enhancement.[13]

The same is true of the Maryland law under which Clay was convicted. Among Clay's two relevant prior convictions was a violation of § 5-602 of the Maryland Criminal Code, which makes it a crime to "distribute or dispense a controlled dangerous substance" or "possess a controlled dangerous substance in sufficient quantity reasonably to indicate under all circumstances an intent to distribute or dispense a controlled dangerous substance." Md. Code Ann., Crim. Law § 5-602. The Code defines the term "distribute" as "to deliver other than by dispensing." *Id.* § 5-101(m). It then defines "deliver" as "an actual, constructive, or *attempted* transfer or exchange from one person to another." *Id.* § 5-101(i) (emphasis added). These definitions make clear that an attempted transfer of a controlled dangerous substance violates Maryland law, whereas under the Guidelines such a crime is not a "controlled substance offense." Thus, Clay is correct that his prior conviction under § 5-602 cannot serve as a predicate offense for a career offender enhancement under the Guidelines.[14]

Although the court agrees with Clay that his prior Maryland drug conviction cannot serve

---

[13] The court reached the same conclusion with respect to a similar North Carolina law just six months later. *United States v. Locklear*, No. 19-4443, 2022 WL 2764421 (4th Cir. July 15, 2022).

[14] In *Campell* and *Locklear* the Fourth Circuit reached its conclusions by tracing the relevant statutes to substantially similar definitions of the word "deliver." *See Campbell*, 22 F.4th at 442 (first quoting W. Va. Code § 60A-4-401(a); and then quoting W. Va. Code § 60A-1-101(h)); *Locklear*, 2022 WL 2764421, at *2 (citing N.C. Gen. Stat. §§ 90-87(7), 90-95(a)(1)).

as a predicate offense for a career offender enhancement, Montemarano did not act unreasonably in failing to pursue the argument at Clay's 2015 sentencing. Until 2018, the federal courts unanimously agreed "that an inchoate crime like attempt or conspiracy *did* constitute a 'controlled substance offense'" for Guidelines purposes. *Campbell*, 22 F.4th at 442 (emphasis added) (collecting cases). Only in 2018 did the D.C. Circuit become "the first court to reject this view." *Campbell*, 22 F.4th at 443 (citing *United States v. Winstead*, 890 F.3d 1082 (D.C. Cir. 2018)). The Fourth Circuit did not follow suit until 2022. *See id.* In 2015, then, it was reasonable for Montemarano to forego a position that had been rejected by every federal circuit court to address it. The court will not grant Clay's motion to vacate on this basis.[15]

### C.  Montemarano's Failure to Challenge 21 U.S.C § 851 as Void for Vagueness

Third, Clay asserts that Montemarano unreasonably failed to dispute the constitutionality of § 841 as void for vagueness. To refresh, in this case Clay was convicted of conspiracy to distribute a controlled substance under 21 U.S.C. §§ 841 and 846. At the time of Clay's conviction, § 841 included a sentencing enhancement imposing a 20-year mandatory minimum on any defendant convicted under § 841 who had "a prior conviction for a felony drug offense." 21 U.S.C. § 841(b)(1)(A) (2012). The statute defined "felony drug offense" as "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct *relating to* narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." *Id.* § 802(44) (emphasis added). The Government sought a 20-year mandatory minimum based on Clay's 1993 conviction for possession with intent to

---

[15] Because the court will not grant Clay relief based on Montemarano's failure to challenge the use of Clay's Maryland conviction as a career offender predicate, it need not reach the Government's argument that such a claim is not cognizable on a § 2255 motion. (*See* Opp. to § 2255 Mot. at 15 & n.9, ECF 878).

distribute, also under § 841. Clay now asserts that applying a mandatory minimum under § 841 is unconstitutional because it relies on the term "relating to" narcotic drugs, which Clay contends is an impermissibly vague definition of a "felony drug offense."

Clay grounds his argument in the Supreme Court's 2015 decision in *Johnson v. United States*, which held that the Armed Career Criminal Act's ("ACCA's") definition of a "violent felony" as "any felony that 'involves conduct that presents a serious potential risk of physical injury to another'" was unconstitutionally vague. *Johnson*, 576 U.S. 591, 593, 597 (2015) (quoting 18 U.S.C. § 924(e)(2)(B)). The Court explained that a statute is unconstitutionally vague where "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Id.* at 595 (citing *Kolender v. Lawson*, 461 U.S. 352, 357-358 (1983)). That is true "not only [of] statutes defining elements of crimes, but also [of] statutes fixing sentences." *Id.* at 596 (citing *United States v. Batchelder*, 442 U.S. 114, 123 (1979)). Applying this principle, the Court held that ACCA's definition of "violent felony" could not stand because it left "grave uncertainty" about how to determine the amount of risk required to trigger the enhancement. *Id.* at 597-98.

In Clay's view, the logic of the Supreme Court's decision concerning ACCA's definition of "violent felony" in *Johnson* extends to § 802's definition of "felony drug offense." On this § 2255 motion, however, that argument cannot prevail. Although the Fourth Circuit has not squarely addressed the issue, at the time of Clay's sentencing other circuits had held that § 802 was not, on its face, unconstitutionally vague. *See, e.g.*, *United States v. Mincoff*, 574 F.3d 1186, 1201-02 (9th Cir. 2009). In the years following *Johnson*, other circuits have agreed, as have numerous district courts in this Circuit. *See, e.g.*, *United States v. Murray*, 826 F. App'x 97, 100 (2d Cir. 2020); *Wilborn v. Joyner*, No. 18-cv-01565, 2018 WL 5839549, at *6 (D.S.C. Nov. 8, 2018), *aff'd*, 785

F. App'x 978 (4th Cir. 2019). In light of this consensus, even if Clay's novel argument had merit, the court could not say Montemarano acted unreasonably in failing to pursue it. And even if his failure to do so were unreasonable, Clay could not have been prejudiced because he was sentenced under the Guidelines—not to § 841's mandatory minimum. The court will not vacate Clay's sentence on this ground.

### D.  Montemarano's Failure to Challenge the Absence of a Duration Element

Fourth, Clay claims Montemarano prejudiced him by failing to request a hearing on the duration of the conspiracy which, Clay contends, is a necessary predicate to determining the amount of heroin involved. In truth, then, Clay is disputing whether the evidence was sufficient to support the jury's conclusion that Clay could foresee the conspiracy involved over one kilogram of heroin. The Fourth Circuit has already reviewed the record once in this case and concluded the jury's verdict on this point was supported by sufficient evidence. *United States v. Garcia*, 665 F. App'x 283, 286-87 (4th Cir. 2016). Aside from repackaging his prior sufficiency of the evidence arguments, Clay introduces no new substantive reason for disturbing the Fourth Circuit's holding. He therefore identifies no prejudice that could follow from the lack of a duration hearing in this case, and the court will not vacate his sentence on that basis.

### E.  Montemarano's Failure to Raise the Foregoing Issues on Appeal

Fifth, Clay argues Montemarano acted unreasonably in failing to raise the issues discussed above on direct appeal. The court has already concluded, however, that Montemarano did not act unreasonably in failing to raise any of these issues at trial. And none of the cases that have changed the law since Clay's sentencing were decided between Clay's trial and his appeal. Thus, Montemarano acted just as reasonably on appeal as he did at trial with respect to the issues in Clay's motion. The court will not grant Clay relief under § 2255 based on ineffective appellate

counsel.

**F.  Clay's Motion to Supplement his § 2255 Motion**

Finally, Clay moves to supplement his original § 2255 motion by requesting resentencing under §§ 401 and 404 of the First Step Act of 2018. (Mot. to Supp. CR Mot.). Even if the motion were properly before the court, however, and even if Clay were entitled to relief under the First Step Act (neither of which the court need decide), his request could at most be construed as seeking resentencing under the newly enacted provisions of § 841. The court has already done just that. Clay's motion to supplement his § 2255 motion will therefore be denied as moot.

All told, Clay's § 2255 motion raises five claims of ineffective assistance of counsel and a request for resentencing under the First Step Act. The court concludes that Clay did not receive ineffective assistance of trial or appellate counsel in any of the ways he suggests and holds further that in light of the court's disposition of Clay's motion for compassionate release, the supplemental § 2255 motion is moot. The court will deny Clay's request for relief under § 2255.

## CONCLUSION

For the reasons discussed above, Clay's motion for compassionate release will be Granted in part and Denied in part, and his motion to vacate his conviction and sentence will be Denied. The court will modify Clay's sentence from the originally imposed term of 360 months to a revised term of 180 months, followed by 120 months of supervised release.

A separate order follows.

_____12/19/2022_____                              _____/s/_____
Date                                                                    Catherine C. Blake
                                                                            United States District Judge